Filed 7/29/16  P. v. Nettles CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DANIEL JAMIN NETTLES, SR., <br><br> Defendant and Appellant. | H041143 <br> (Santa Clara County <br> Super. Ct. No. C1121309) |

## I.      INTRODUCTION

Defendant Daniel Jamin Nettles, Sr. appeals after a jury found him guilty of pimping a minor over the age of 16 (Pen. Code, § 266h, subd. (b)(1)),[1] procuring a minor over the age of 16 for prostitution (§ 266i, subd. (b)(1)), pimping an adult (§ 266h, subd. (a)), and human trafficking a person under the age of 18 (§ 236.1, subd. (c)).  Eden Doe was the alleged victim in the three counts involving a minor, while Mia Doe was the alleged victim in the count of pimping an adult.

Defendant was sentenced to an eight-year prison term for human trafficking, with a consecutive one-year four-month prison term for pimping an adult.  The terms for the other two offenses were stayed pursuant to section 654.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant contends the trial court erred by instructing the jury on human trafficking pursuant to a version of CALCRIM No. 1243 that incorporated post-offense amendments to section 236.1. Defendant also contends that the trial court erred by failing to instruct the jury that Mia Doe was an accomplice whose testimony required corroboration, and that the instructional errors cumulatively prejudiced him. For reasons that we will explain, we will affirm the judgment.

## II. BACKGROUND

### A. Testimony of Eden Doe

Eden Doe was 16 years old in March of 2010. She was about five feet three inches tall and weighed about 125 pounds. Eden had heard her friend Cherish mention defendant's name before and knew that he lived in the same apartment complex as her friend. Cherish had mentioned that defendant was a pimp.

One night, Eden snuck out of her house and stayed out all night with a friend. On her way home the next morning, Eden met defendant at a light rail station. Defendant appeared to be about six feet tall and appeared to weigh about 190 pounds.[2] Eden asked defendant for a cigarette and then conversed with him. Defendant invited Eden to come over to his apartment, indicating he would give Eden some marijuana. Eden went home instead, but after her mother yelled at her, she returned to the light rail station, where she again saw defendant. Defendant suggested they go smoke marijuana at his apartment with his girlfriend. Eden agreed and accompanied defendant to his apartment.

Defendant's girlfriend, Mia, was at the apartment, along with two small children. Eden, Mia, and defendant smoked marijuana in the living room. When their conversation turned to prostitution, defendant told Eden "that was what [she was] going to do." Mia agreed, saying, "[Y]eah." Defendant had been "really nice" at first, but at this point he

---

[2] Defendant testified that he was five feet ten inches tall and weighed about 172 or 173 pounds at that time.

became more serious and made her feel scared.  At some point, defendant told Eden that he knew what school she attended and that he would send Mia to Eden's school to beat her up.

Eden had never performed any acts of prostitution before.  Defendant said that Mia would teach Eden "how to do it."  Eden was "really scared" and thought she was going to die.  At defendant's direction, Eden followed Mia into a bedroom.  Mia gave Eden clothes to wear, including shorts that exposed part of her buttocks.

Defendant received a call on his cell phone.  He handed the phone to Mia, who had a conversation with the person on the other end of the line.  Afterwards, defendant and Mia told Eden they were going to a Jack in the Box.  Feeling "forced" to go, Eden accompanied Mia to the Jack in the Box, where they met three men.  Two of the men were Latin and one was African American.  Mia seemed to know the men.  Eden and Mia got into a car with the three men.  They drove to a liquor store, where the men purchased alcohol, and then to a hotel.  Eden and Mia went into a hotel room with one of the Latin men.  Eden was given beer to drink, and she smoked more marijuana.

At some point, Mia was talking on the phone, and Eden could hear defendant's voice on the other end of the line.  Mia told Eden to talk to defendant and to say that "everything was okay."  When Eden got on the phone, defendant asked about the race of the three men.  Mia instructed Eden to say that the men "weren't black," and Eden complied.

After the phone call, Mia instructed Eden to go into the bathroom, where the Latin man was taking a shower after having had sex with Mia.  When the Latin man got out of the shower, he told Eden to take off her clothes, and she complied.  The Latin man put his penis in Eden's vagina.  Mia then knocked on the door.  She told Eden, "Let's go," and they left the hotel room.  Mia was on the phone with defendant again, and she was counting money.  Eden spoke to defendant, who was asking "if everything was okay."

3

Eden could hear defendant, Mia, and the three men engaging in negotiations. Afterward, Eden went back into the hotel room, where she watched Mia perform oral sex on one of the men. Eden and Mia then left the hotel again, and Eden saw Mia counting money again. They took a taxi cab back to defendant's apartment.

At the apartment, Eden got onto a mattress with defendant and Mia. Eden removed her clothing after defendant told her to because she was "scared for [her] life." Defendant had oral sex with both Eden and Mia. Defendant then instructed Eden and Mia to give each other oral sex. However, they did not do so.

At some point, Mia got up out of bed. Defendant then got on top of Eden and began having sex with her. Defendant also put his penis into Eden's mouth. Defendant, who did not use a condom, told Eden that she was "going to be his next baby momma."

Eden spent the night in defendant's apartment. When she woke up in the morning, Eden smoked more marijuana, which defendant gave to her. Defendant asked her questions about what had happened at the hotel. Eden told defendant that the three men were African American and Latin. She also told defendant that she had sex with one of the Latin men. Defendant became angry and began yelling. He was upset that one of the men was African American, and he told Mia that Eden should have just watched and learned. Defendant was "scary" when he was yelling, and he hit Mia in the face. Defendant then grabbed Mia by the hair and threw her to the ground. This scared Eden, who thought "he could do that to [her]."

Defendant told Eden to get ready to leave and said they were going to "The Blades." Mia again gave Eden "revealing" clothes to wear. Eden, Mia, defendant, and the two children took a train from the light rail station to a BART station. During the train ride, defendant repeatedly instructed Eden not to look up and not to look at any other guys. Eden complied because she was scared.

At the Concord BART station, defendant's mother and stepfather picked up the group. Defendant and his parents spoke about "mak[ing] some money." They went to a

4

park, where Eden smoked more marijuana with Mia and defendant. Defendant's parents then drove to a parking lot, where they dropped Eden and Mia off. Defendant told Eden and Mia to "see if there were any tricks." Eden and Mia walked around, talking to men who drove up in cars. The men asked questions such as "how much money are you going to charge" and "do you do drugs." Neither Eden or Mia got into a car with any of the men.

Defendant later returned to the parking lot. Defendant was mad at Eden because he had instructed her not to look at other guys. Defendant said he was going to "take it out on Mia," who should have told Eden the rule.

Eden and Mia continued to walk around, but they never found any customers. Mia eventually brought Eden to a house where defendant was present along with another woman and a child. Defendant told the other woman that Eden was his "new girl," and Mia and the other woman discussed teaching Eden "how to be a ho."

After about an hour, defendant's mother drove the group back to defendant's parents' house. On the drive, defendant and his stepfather argued about how to teach Eden "to be a ho." Defendant's stepfather said he was going to call someone to teach her, but defendant said that "he had it under control." Defendant's stepfather also said that he wanted Eden, which scared her. Defendant's parents were mad that Eden and Mia had not found anyone to give them money for sex. At the house, defendant's parents talked about "chains and whips." Defendant's mother eventually drove defendant, Eden, Mia, and the children back to San Jose.

Back at defendant's apartment, defendant instructed Eden and Mia to get naked and get into the bed. Defendant had sex with Eden and may also have had sex with Mia.

The next morning, Eden got up and went to the bathroom. Eden waited until she thought it was safe and then left the apartment. Eden went to school, but she got into trouble at school for failing to attend detention. Her father picked her up from school and later brought her to a hospital.

5

### B.     *Testimony of Mia Doe*

Mia Doe was found unavailable after she failed to appear at trial, and thus her preliminary hearing testimony was read to the jury.  At the preliminary hearing, she testified pursuant to an agreement that the prosecution would not use any of her testimony against her.

Defendant was Mia's boyfriend in 2010.  Before meeting defendant, Mia had engaged in sex with men for money.  After defendant moved in with her and her children, Mia would sometimes have sex for money if they did not have enough money for food, which often happened at the end of the month.  Defendant had no job during the time he and Mia lived together.  Mia would sometimes give defendant money.

When Eden first came over to the apartment, Mia commented that she looked "really young," but Eden replied, "I'm grown enough."  According to Mia, Eden came over looking for defendant.  When Mia went into the bedroom to get dressed, Eden followed her and asked what she was doing.  Mia said she was going "turn a date" because she needed money.  Eden said she wanted to go.  When Mia questioned why, Eden said, "Oh, I've done it before."  Mia and Eden then left the apartment.  According to Mia, Eden remained in the clothes she had been wearing when she arrived at the apartment.

Mia and Eden walked to a Jack in the Box, where they met three "johns" that Mia had arranged to meet.  Mia and Eden got into a car with the men, who drove to a liquor store and then a hotel.  One of the men rented a room, and they all went into the room.  Eden followed Mia into the bathroom, where they discussed "what [they] were about to do."  One of the men, who was half African American, came into the bathroom and said he wanted to have sex with Eden and that he would pay $100, the amount Mia had previously discussed with him.  Mia performed oral sex on the man, then left the bathroom.

6

Mia later knocked on the bathroom door and asked if Eden was okay. Mia said that she had to call "dad," referring to defendant. When she called defendant, he asked to speak with Eden. Mia denied telling Eden what to say to defendant, but she acknowledged that defendant had a rule against having sex with other African American men.

Eden gave Mia around $150 to hold after coming out of the bathroom. Mia and Eden left the hotel but came back after one of the three men called. Eden went with one of the men to a second room. When she returned, she gave Mia another $150 to hold. Mia and Eden then called a cab and left. During the cab ride, Eden was holding her head and had watery eyes. Eden said she was fine, however. Mia paid for the cab and then gave Eden the rest of her money back. Eden later gave the money to defendant.

Mia and Eden returned to the apartment. After dinner, Mia and defendant had sexual intercourse. Defendant then told Mia and Eden to have sexual intercourse with one another. According to Mia, they did so, even though she did not want to. Mia was afraid of defendant becoming angry and hitting her, which he had done before.

The next morning, defendant pulled Mia out of bed by her hair. He reprimanded Mia for having "let a black guy touch" Eden, and then he beat her. Defendant then told Mia to get dressed and to get Eden some clothes. Defendant said they were going out of town, but he did not say where they were going.

Eden, Mia, defendant, and Mia's children went to the light rail station and took a train to the Fremont BART station, then took a BART train to Concord. Defendant's mother took the group to Fairfield, where they dropped Mia's children off at the home of defendant's "baby mama" and then to an area where defendant had brought her before. Defendant and Eden got out, and defendant said, "You know what to do." Mia and Eden walked around all day, but neither was able to solicit any customers. Defendant came back to check on them at one point.

Mia denied that defendant was a pimp for her or Eden. She asserted that Eden wanted to do everything that she did. Eden was not shy or afraid and appeared comfortable interacting with Mia and defendant. Eden brought and smoked her own marijuana. Eden did not want to go home and said that her parents were going to send her away.

Mia had five prior convictions of crimes involving moral turpitude, including a 2007 conviction of engaging in prostitution, a 2004 conviction of loitering with the intent to commit prostitution, and three convictions of petty theft.

### C. *Investigation*

After going to the hospital, Eden was transported for a Sexual Assault Response Team exam. Sexual Assault Forensic Examiner Celia Breazile examined Eden. Eden reported that defendant had put his penis into her vagina two times and had also put his fingers into her vagina and his mouth on her vagina. She referred to defendant as a "wannabe pimp" and reported that defendant called her "one of [his] hos." Eden reported having had sexual intercourse with a second person as well, referring to him as "some trick." Breazile observed abrasions and redness as well as debris during her vaginal exam of Eden. She took DNA and semen swabs during the exam. Later tests confirmed the presence of semen. Defendant was the source of the semen.

San Jose Police Officer Tam Truong interviewed Mia. The interview was played for the jury at trial. Mia's statement was inconsistent with her preliminary hearing testimony in several respects: Eden had not claimed to have prior experience prostituting, defendant was Mia's pimp and would take her money after she engaged in prostitution, and Eden did not smoke her own marijuana at the apartment.

Officer Truong also interviewed defendant. The interview was played for the jury at trial. Defendant admitted having been a pimp and intending to be Mia's pimp, but he claimed she was "a dope fiend" who did what she wanted, causing him not to want to pimp any more. Defendant denied knowing Eden but recognized a photograph of her as

8

someone who hung out with Cherish.  Defendant denied inviting Eden to his apartment, talking to her about prostitution, and having sex with her.  Defendant speculated that his sperm could be in Eden's vagina if she had taken a condom out of the trash and put it into her vagina.  Defendant consented to a DNA swab.

San Jose Police Officer Jeremy Martinez testified as an expert in human trafficking.  Pimps are often called "dad" or "daddy" by the prostitutes working for them, but sometimes prostitutes consider their pimps to be their boyfriends.  A prostitute may be referred to as a "ho" or a "bitch."  A "trick" or a "john" is someone who pays for sexual services.  The phrase "walk the blade" means to walk in an area where prostitution frequently occurs.  Pimps often target runaways for prostitution because they are easily manipulated.  Pimps commonly go to places like public transportation sites to find women.  Pimps will often offer women alcohol or drugs and then manipulate them into becoming prostitutes.  Pimps sometimes seek to get a woman pregnant in order to create a "sense of connection" so that they can assert more control.  It is common for a pimp to have a rule against prostitutes having sex with other black men, because the pimp fears that other black men are pimps and that the pimp will lose his income from his prostitutes.  It is also common for a pimp to require his prostitutes to keep their heads down, as a sign of submission.

### D.    *Defense Case*

Defendant admitted that he was a pimp when he met Mia.  He had met Mia through an ex-girlfriend and had helped her move into her San Jose apartment.  Mia said she used to work as a prostitute but that she had not been getting any "dates" lately.  Mia wanted defendant to help her.  Defendant agreed.  At some point, Mia said she "didn't want to do it," but defendant later discovered that Mia was working as a "renegade" prostitute, without him serving as her pimp.  By March of 2010, he did not consider himself a pimp.

Defendant claimed he did not know Eden, although he had seen her at his apartment complex before. The only other time he had seen her was in court. He would not have pimped for a 16-year-old girl, nor would he be interested in such a young girl romantically. Defendant believed that Mia had used Eden to set him up.

Defendant admitted he had pleaded guilty to misdemeanor domestic violence. He initially asserted that Mia had lied about him beating her, but he later admitted he had pushed and slapped her. Defendant also admitted he had been convicted of felony drug possession, misdemeanor battery, misdemeanor receiving stolen property, felony battery on a spouse or cohabitant, and forgery or passing a bad check (two convictions). He had been arrested for pimping, which led to a probation violation.

### E.      Charges, Verdicts, and Sentence

Defendant was charged with pimping a minor over the age of 16 (§ 266h, subd. (b)(1); count 1), procuring a minor over the age of 16 for prostitution (§ 266i, subd. (b)(1); count 2), pimping an adult (§ 266h, subd. (a); count 3), and human trafficking a person under the age of 18 (§ 236.1, subd. (c); count 4). Counts 1, 2, and 4 pertained to Eden Doe; count 3 pertained to Mia Doe.

A jury found defendant guilty of all four charges. The trial court sentenced defendant to an eight-year prison term for human trafficking (count 4), with a consecutive one-year four-month prison term for pimping an adult (count 3); the terms for the other two offenses (counts 1 and 2) were stayed pursuant to section 654.

## III.      DISCUSSION

### A.      Challenges to Human Trafficking Instruction

Defendant challenges the jury instruction on human trafficking, claiming the instruction erroneously incorporated amendments to section 236.1 that became effective after the March 2010 incident involving Eden Doe. Defendant contends that when section 236.1 was amended in 2012, the definition of human trafficking was broadened,

10

and thus the instruction violated the state and federal prohibitions against ex post facto laws. Defendant also contends that the instruction on human trafficking violated his rights under the due process and jury trial provisions of the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution.

### 1. Legal Background

"Article I, section 10 of the United States Constitution provides: 'No state shall . . . pass any . . . ex post facto law . . . .' The ex post facto clause prohibits only those laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.' [Citation.]" (*People v. McKee* (2010) 47 Cal.4th 1172, 1193.) The California state Constitution also prohibits ex post facto application of laws. (Cal. Const., art. I, § 9; see *People v. Farley* (1996) 45 Cal.App.4th 1697, 1705.)

In March of 2010, former section 236.1 provided in pertinent part: "(a) Any person who deprives or violates the personal liberty of another with the intent to effect or maintain a felony violation of Section 266, 266h, 266i, 267, 311.4, or 518, or to obtain forced labor or services, is guilty of human trafficking. [¶] . . . [¶] (d)(1) For purposes of this section, unlawful deprivation or violation of the personal liberty of another includes substantial and sustained restriction of another's liberty accomplished through fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out. [¶] (2) Duress includes knowingly destroying, concealing, removing, confiscating, or possessing any actual or purported passport or immigration document of the victim." (Stats. 2005, ch. 240, § 7.)

In 2012, section 236.1 was amended by Proposition 35 and substantially rewritten. (Prop. 35, as approved by voters, Gen. Elec. (Nov. 6, 2012) [see § 6].) The offense described in former section 236.1, subdivision (a) is now described in section 236.1, subdivision (b), with additional enumerated target offenses: "Any person who deprives

or violates the personal liberty of another with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking . . . .''

The 2012 amendments to section 236.1 placed the definitions of certain terms in subdivision (h). Section 236.1, subdivision (h)(3) provides: '' 'Deprivation or violation of the personal liberty of another' includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.'' Section 236.1, subdivision (h)(4) provides: '' 'Duress' includes a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to acquiesce in or perform an act which he or she would otherwise not have submitted to or performed; a direct or implied threat to destroy, conceal, remove, confiscate, or possess any actual or purported passport or immigration document of the victim; or knowingly destroying, concealing, removing, confiscating, or possessing any actual or purported passport or immigration document of the victim.''

Section 236.1, subdivision (i) now provides: ''The total circumstances, including the age of the victim, the relationship between the victim and the trafficker or agents of the trafficker, and any handicap or disability of the victim, shall be factors to consider in determining the presence of 'deprivation or violation of the personal liberty of another,' 'duress,' and 'coercion' as described in this section.''

### 2. Proceedings Below

Pursuant to CALCRIM No. 1243, the jury was instructed as follows: ''The defendant is charged in count four with human trafficking in violation of Penal Code Section 236.1. To prove that the defendant is guilty of this crime, the People must prove that: [¶] (1) The defendant either deprived another person of personal liberty or violated

12

that other person's personal liberty; and [¶] (2) When the defendant did so, he intended to effect or maintain a felony violation of Penal Code Section 266 (h) or Penal Code Section 266 (i). [¶] Deprivation [or] violation of personal liberty as used here includes substantial and sustained restriction of another [person's] liberty accomplished through fraud, deceit, coercion, violence, duress, menace, [or] threat of unlawful injury to the victim, or to another person under circumstances in which the person was receiving or perceiving the threat reasonably believes that [it is] likely that the person making the threat would . . . carr[y] it out. [¶] Duress means a direct or implied threat of violence, danger, hardship, or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and his or her relationship to the defendant."

Defendant did not object to the above instruction.

### 3. Analysis

The question presented in this case is whether, at the time of defendant's offenses, section 236.1 defined duress solely in terms of "knowingly destroying, concealing, removing, confiscating, or possessing any actual or purported passport or immigration document of the victim" (former § 236.1, subd. (d)(2); see Stats. 2005, ch. 240, § 7) or whether duress also could be found if the defendant made "a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to acquiesce in or perform an act which he or she would otherwise not have submitted to or performed" (§ 236.1, subd. (h)(4)). This case also presents the question of whether, at the time of defendant's offenses, "[t]he total circumstances, including the age of the victim" could to be considered in determining the existence of duress. (§ 236.1, subd. (i).) In other words, we must determine whether the 2012 amendments to section 236.1 expanded the definition of duress or merely clarified existing law.

13

We apply settled rules of statutory construction in determining the meaning of "duress" as used in former section 236.1.  In interpreting the statute, " 'our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.]  'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.'  [Citations.]  The plain meaning controls if there is no ambiguity in the statutory language.  [Citation.]  If, however, 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " '  [Citation.]"  (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265 (*Cornett*).)

Looking at the plain meaning, the statute in effect at the time of defendant's offenses did not limit the definition of duress to acts involving passports or immigration documents.  Rather, former section 236.1, subdivision (d)(2) provided that "[d]uress *includes* knowingly destroying, concealing, removing, confiscating, or possessing any actual or purported passport or immigration document of the victim."  (Stats. 2005, ch. 240, § 7, italics added.)  " 'Includes' is 'ordinarily a term of enlargement rather than limitation.'  [Citation.]  The 'statutory definition of a thing as "including" certain things does not necessarily place thereon a meaning limited to the inclusions.'  [Citation.]" (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774.)  Thus, by using the word "includes," the Legislature indicated that "knowingly destroying, concealing, removing, confiscating, or possessing any actual or purported passport or immigration document of the victim" (Stats. 2005, ch. 240, § 7) would be *sufficient* to constitute duress for purposes of former section 236.1, but that such an act would not be *necessary* for a finding of duress.  (See *People v. Arnold* (2006) 145 Cal.App.4th 1408, 1414 [reading the word "includes" as a term of enlargement in statutes defining "firearm"].)  Moreover, "interpretations that

14

render statutory terms meaningless as surplusage are to be avoided" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1010 (*Hudson*)), and defendant's proposed interpretation of former section 236.1, subdivision (d)(2) would render the term "includes" meaningless.

Defendant points out that "there are exceptions to the rule" regarding the term "includes," relying on *People v. Horner* (1970) 9 Cal.App.3d 23 (*Horner*). That case does not support defendant's position, however. In *Horner,* the court examined former section 12401, which purported to define "tear gas" for purposes of certain penal statutes. (*Horner, supra,* at pp. 26-27.) The statute provided: " ' "Tear gas" ' as used in this chapter shall apply to and include all liquid, gaseous or solid substances intended to produce temporary physical discomfort or permanent injury through being vaporized or otherwise dispersed in the air. . . ." (*Ibid.*) Applying the principle that "the words 'include' and 'including' are ordinarily words of enlargement, and not of limitation," the court held that the Legislature intended the term "tear gas" "to include substances not ordinarily understood to be tear gas." (*Id.* at p. 27.) Thus, contrary to defendant's representation, the *Horner* court did not find an exception to the general rule of statutory interpretation regarding the word "includes."

Defendant presents several additional arguments in support of his claim that the plain meaning of former section 236.1 is not dispositive. First, defendant contends the legislative history shows that the Legislature enacted former section 236.1 in order to curb international human trafficking and that the statute was not intended to apply to "general prostitution offenses."

As noted above, the plain meaning of a statute controls if there is no ambiguity in the statutory language, and we look to legislative history only if " 'the statutory language may reasonably be given more than one interpretation.' " (*Cornett, supra,* 53 Cal.4th at p. 1265.) Since we have concluded that under the plain meaning of former section 236.1, "duress" was not limited to acts involving a victim's passport or immigration document, we need not consider the legislative history. However, even assuming that the definition

15

of the "duress" was ambiguous, the legislative history does not support defendant's position.[3]

Defendant references bill analyses of Assembly Bill 22 (A.B. 22), which enacted former section 236.1 in 2005.  As defendant notes, the bill's author described human trafficking as "the fastest growing industry in the world" and cited statistics about the number of people who were being trafficked into the United States.  (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 22 (2005-2006 Reg. Sess.) as amended Sept. 7, 2005, p. 10.)  However, as the Attorney General points out, the bill's author also referenced the number of American children who are victims of human trafficking annually.  (See Sen. Com. on Pub. Saf., Analysis of Assem. Bill No. 22 (2005-2006 Reg. Sess.) as amended June 16, 2005, p. P.)  The bill's author also noted that in addition to confiscating passports and visas, human traffickers "keep victims enslaved" through "debt bondage, isolation from the public, and confiscation of . . . pieces of identification."  (See Sen. Com. on Pub. Saf., Analysis of Assem. Bill No. 22 (2005-2006 Reg. Sess.) as amended June 16, 2005, p. P.)  Another bill analysis quoted from a report on human trafficking, which stated that while the majority of victims come from abroad, some victims are "United States citizens who have fallen into the clutches of traffickers."  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 22 (2005-2006 Reg. Sess.) as amended April 21, 2005, p. E.)  The legislative history thus shows that former section 236.1 was enacted to combat human trafficking of all types, including but not limited to international human trafficking.

Defendant next contends that the 2012 amendments to section 236.1 show that the Legislature was "clean[ing] up an oversight" with respect to the definition of duress, rather than clarifying the meaning of that term.  In fact, former section 236.1 was

---

[3] We have taken judicial notice of several documents from the legislative history of former section 236.1, pursuant to the parties' requests.

amended by the electorate, not the Legislature, through Proposition 35, which enacted the Californians Against Sexual Exploitation Act (CASE Act). (Prop. 35, as approved by voters, Gen. Elec. (Nov. 6, 2012) [see §§ 1, 6].) Nothing in the ballot materials or text of the initiative measure indicates that the electorate's intent was to expand the definition of duress. The Legislative Analyst's analysis of Proposition 35, printed in the ballot pamphlet for the General Election of November 6, 2012, states that the initiative would include more crimes in the definition of human trafficking, increase penalties for human trafficking, provide services for human trafficking victims, change evidentiary rules in human trafficking cases, require law enforcement training in human trafficking, and expand requirements for sex offenders. Likewise, nothing in the "Findings and Declarations" or "Purpose and Intent" sections of the CASE Act indicates an intent to expand the definition of duress. (Prop. 35, as approved by voters, Gen. Elec. (Nov. 6, 2012) [see §§ 2, 3].)

The Attorney General asserts that the 2012 addition of a more general and expansive definition of duress "merely codified the long-standing judicial construction of the term . . . ." In other words, when the Legislature enacted section 236.1 in 2005, it intended duress to have a meaning consistent with the definition provided by case law. As explained below, we agree.

In 1985, the court in *People v. Pitmon* (1985) 170 Cal.App.3d 38 (*Pitmon*) noted that "[d]uress, as an element of a criminal offense[,] ha[d] not been previously given legal definition." (*Id.* at p. 48.) The *Pitmon* court held that in the context of section 288, which prohibits lewd acts, duress should be given its "commonly understood meaning." i.e., "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*Pitmon, supra,* at p. 50, fn. omitted.) The court further noted, "The total circumstances, including the age of the victim, and his

17

relationship to defendant are factors to be considered in appraising the existence of duress." (*Id.* at p. 51.) In 2004, the California Supreme Court noted that "[t]he *Pitmon* definition of 'duress' ha[d] been followed consistently for almost 20 years," not just with respect to section 288 but with respect to other sex offenses. (*People v. Leal* (2004) 33 Cal.4th 999, 1004, 1005 (*Leal*).)

"It is a settled principle of statutory construction that the Legislature ' "is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof. [Citation.]" [Citation.]' [Citation.] Courts may assume, under such circumstances, that the Legislature intended to maintain a consistent body of rules and to adopt the meaning of statutory terms already construed. [Citations.]" (*People v. Scott* (2014) 58 Cal.4th 1415, 1424.)

Here, at the time former section 236.1 was enacted in 2005, the term "duress" had a "commonly understood meaning" confirmed by case law. (See *Pitmon, supra,* 170 Cal.App.3d at p. 50; *Leal, supra,* 33 Cal.4th at pp. 1004-1005.) That meaning was "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*Pitmon, supra,* at p. 50, fn. omitted.) It was also settled that in determining the existence of duress, "[t]he total circumstances, including the age of the victim, and his relationship to defendant are factors to be considered." (*Id.* at p. 51.) The instruction on duress given in the instant case was consistent with this definition.

Defendant argues that the Legislature could not have intended to adopt the *Pitmon* definition of duress when it enacted former section 236.1 in 2005, because there were other definitions of duress in existence at that time. First, as noted in *Pitmon,* the term duress was defined differently for the defense of duress (§ 26, subd. (6)). In *Pitmon,* the court noted that "[t]he *defense* of duress" had a different definition—"it is established

18

only if one acted out of fear of imminent death or great bodily harm"—and found that definition to be "inapplicable" in the context of an element of a sex offense. (*Pitmon, supra,* 170 Cal.App.3d at p. 49.) Second, as noted in *Leal,* the term duress was defined differently for the crimes of rape (§ 261, subd. (b)) and spousal rape (former § 262, subd. (c); Stats. 1996, ch. 1077, § 15). (See *Leal, supra,* 33 Cal.4th at p. 1007.) In *Leal,* the court found it "clear" that the definitions of duress in the rape and spousal rape statutes did not apply "to any other sexual offenses." (*Ibid.*) Since section 236.1 did not involve the defense of duress or the crimes of rape or spousal rape, it is reasonable to find the Legislature intended former section 236.1 to incorporate the *Pitmon* definition of duress, including the factors to be considered in determining the existence of duress.

Next, defendant points out that following the 2012 amendments to section 236.1, the Bench Notes to CALCRIM No. 1243 provided: "This instruction is based on the language of the statute effective November 7, 2012, and only applies to crimes committed on or after that date." However, the 2012 amendments to section 236.1 changed more than the definition of duress. The 2012 amendments to section 236.1 also amended the definition of the phrase "[d]eprivation or violation of the personal liberty of another." (Compare former § 236.1, subd. (d)(1) [Stats. 2005, ch. 240, § 7] with § 236.1, subd. (h)(3).) Thus, it is far from clear that the cautionary admonition in the Bench Notes was intended to apply to the definition of duress. Moreover, "the Bench Notes and the CALCRIM jury instructions are not themselves legal authority." (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1269.)

Finally, defendant argues that the rule against rendering statutory language surplusage (see *Hudson, supra,* 38 Cal.4th at p. 1010) should lead this court to hold that the Legislature intended to give "duress" a restricted meaning in former section 236.1 As defendant points out, the 2012 amendments to section 236.1 changed the definition of the phrase "[d]eprivation or violation of the personal liberty of another" to specify that a "substantial and sustained restriction of another's liberty" may be accomplished through

19

"force" or "fear" in addition to "fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person." (§ 236.1, subd. (h)(3); see former § 236.1, subd. (d)(1); Stats. 2005, ch. 240, § 7.) However, this change did not affect the definition of duress, which is defined as including "a direct or implied *threat of* force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to acquiesce in or perform an act which he or she would otherwise not have submitted to or performed." (§ 236.1, subd. (h)(4), italics added.) A threat of force or violence is not the same as actual force or violence. Thus, including a "threat of force" in the definition of duress does not render meaningless the terms "force," "violence" and "threat of unlawful injury" as used in the current definition of "deprivation or violation of the personal liberty of another" under section 236.1, subdivision (h)(3).

Because the jury instruction on human trafficking correctly stated the definition of duress in effect at the time of defendant's offenses, the instruction did not violate the prohibitions against ex post facto laws or defendant's rights under the Fifth, Sixth, and Fourteenth Amendments.

### B. *Failure to Instruct on Accomplice Testimony*

Defendant contends the trial court erred by failing to instruct the jury that Mia Doe was an accomplice whose testimony required corroboration.

#### 1. Legal Background

Section 1111 provides that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

20

A person is "liable to prosecution" for an offense (§ 1111), if he or she is a principal to that offense. (*People v. Lewis* (2001) 26 Cal.4th 334, 368-369 (*Lewis*).) Principals are "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ." (§ 31.)

"When there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 965-966, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Whether a witness is an accomplice is a question of fact for the jury when the facts are disputed or susceptible to different inferences. However, if the evidence establishes as a matter of law that the witness is an accomplice, the court must instruct the jury of that fact. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1270-1271.) Furthermore, if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony. (*Lewis, supra,* 26 Cal.4th at p. 369.) A defendant has the burden to prove by a preponderance of the evidence that a witness is an accomplice. (*People v. Fauber* (1992) 2 Cal.4th 792, 834.)

### 2.     Analysis

Defendant asserts that Mia was liable to prosecution for pimping, since Mia knew Eden was a prostitute and used some of the proceeds of Eden's prostitution. (See § 266h, subd. (b).) Defendant points out that the prosecutor even told the jury that Mia could have been charged because she, like defendant, had encouraged Eden to be a prostitute and "took the money."

The Attorney General contends that defendant "did not prove by a preponderance of the evidence that Mia was an accomplice," because in his trial testimony he "vehemently denied knowing Eden and instead suggested that he was being set up by Mia

21

and/or Eden." However, a defendant need not affirmatively introduce evidence in order for the trial court to give an accomplice testimony instruction. "When the prosecution calls an accomplice as a witness, the trial court must instruct the jury that the witness's testimony should be viewed with distrust." (*People v. Mincey* (1992) 2 Cal.4th 408, 461.) The cases cited by the Attorney General are inapposite and do not hold that an accomplice instruction is unnecessary when, as here, the sole defendant denies guilt. (See, e.g., *People v. Sagehorn* (1956) 140 Cal.App.2d 138, 150-151 [no evidence witness was the defendant's accomplice]; *People v. Terry* (1970) 2 Cal.3d 362, 399 [accomplice instruction would have been prejudicial to codefendant who "testified in her own behalf, not as a prosecution witness, and denied her guilt"], disapproved of on other grounds by *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382.)

We will assume that an accomplice instruction should have been given because there was "record evidence" indicating that Mia "participated in (or aided and abetted)" the crimes of pimping or pandering. (See *People v. Williams* (1997) 16 Cal.4th 153, 247.) We proceed to consider whether the error was prejudicial.

"A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]' [Citation.] The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*Lewis, supra,* 26 Cal.4th at p. 370.)

Defendant argues that he was prejudiced by the lack of an accomplice instruction because there was no corroboration of Mia's testimony that Eden gave money to defendant. (See § 266h, subd. (b) [crime of pimping a minor requires that the defendant "lives or derives support or maintenance in whole or in part from the earnings or

22

proceeds of the person's prostitution" or "solicits or receives compensation for soliciting for the person"].)

As noted above, corroborating evidence need not establish every element of the charged offense. (*Lewis, supra,* 26 Cal.4th at p. 370.) " ' "[O]nly a portion . . . of the accomplice's testimony need be corroborated" ' " and "[i]t is only required that the evidence ' " 'tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the [accomplice] is telling the truth.' " ' [Citation.]" (*People v. Miranda* (1987) 44 Cal.3d 57, 100, abrogated on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)

Here, Mia's testimony about defendant pimping Eden was corroborated by Eden in many respects, and Eden's testimony tended to connect defendant with the commission of that offense such that the jury could be reasonably satisfied that Mia was telling the truth. Eden corroborated Mia's testimony about how the two of them met three men at a Jack in the Box and went to a hotel with the men, about how Eden went into the bathroom with one of the men, and about how Mia and Eden both spoke to defendant on the phone afterwards. Eden's testimony also corroborated Mia's testimony about other matters, including defendant's order that Eden and Mia engage in sexual acts with each other, defendant's physical abuse of Mia, and the trip to Concord. In addition, defendant's sperm was found in Eden's vagina, which further connected defendant to the charged offenses. Also, Mia's testimony was corroborated by the expert, who explained that a pimp is often referred to as "dad," the term Mia said she used when referring to defendant, and that many pimps have a rule again their prostitutes having sex with other African American men, as Mia testified defendant had. The instant case is thus distinguishable from the case defendant relies on, in which the alleged accomplice's testimony was "crucial" because he was the only witness to have seen the defendant attack a particular victim. (*People v. Hernandez* (2003) 30 Cal.4th 835, 876, disapproved of on other grounds by *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)

In addition, "other instructions given . . . were sufficient to inform the jury to view [Mia's] testimony with care and caution." (See *Lewis, supra,* 26 Cal.4th at p. 371.) The jury learned that Mia had five prior convictions of crimes involving moral turpitude and that she was testifying under an immunity agreement with the prosecution. Pursuant to CALCRIM Nos. 226 and 316, the jury was instructed that a felony conviction and a promise of immunity could be considered when evaluating a witness's testimony. Thus, "there was no reasonable probability that defendant would have received a more favorable result if the trial court instructed the jury to view [Mia's] testimony with distrust. [Citation.]" (*Lewis, supra,* 26 Cal.4th at p. 371.)

### C.    *Cumulative Prejudice*

Defendant contends there was cumulative prejudice from the multiple alleged errors in this case. (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].) However, we have not found multiple errors and thus there is no cumulative prejudice.

## IV.    DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

MIHARA, J.